IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Vickie Danson Bradley, ) | |
| ) | Civil Action No. 8:04-21818-GRA-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Household International, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment. In her complaint, the plaintiff alleges causes of action for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, against her former employer, Household International, Inc. ("defendant" or "Household").

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff began working for the defendant loan company in October 1997 as an account executive. In March 2001, the plaintiff became the branch manager for the defendant's Anderson, South Carolina, branch. The defendant regularly evaluated the plaintiff's performance and consistently rated her as meeting its expectations (pl. resp. m.s.j., ex. 7, pl. aff. ¶ 2). In October 2001, Jeff Bowen was assigned to the plaintiff's branch as an account executive. The plaintiff claims that while he was under her supervision, Bowen subjected her to "vulgar and sexual comments and actions" (pl. resp. m.s.j. 2). Specifically, the plaintiff alleges that Bowen did the following:

> (1) During the time that the plaintiff was Bowen's supervisor, Bowen stated to the plaintiff that her fiancé must be dating her because she was a "good fuck" (pl. dep. 28).
>
> (2) In November 2001, Bowen called the plaintiff's fiancé/husband a "faggot" (pl. resp. m.s.j., ex. B, Fleda Rice dep. 95; pl. dep. 27-28).
>
> (3) During the time that the plaintiff was Bowen's superior, he told her that she looked good in blue and that she had the "best body of a woman her age" (pl. dep. 126-27).
>
> (4) Bowen displayed a picture of Britney Spears in "suggestive clothing" on his laptop at work (pl. dep. 129-30).
>
> (5) In October 2001, Bowen called the plaintiff's home and was told by her fiancé that she would have to call him back because she was taking a bath. Bowen told the plaintiff that he could not get the vision of her taking a bubble bath out of his head (pl. dep. 24).
>
> (6) In November 2001, Bowen once picked a piece of lint off of the plaintiff's rear end (pl. dep. 25-26).

The plaintiff did not formally counsel or discipline Bowen for any of the alleged acts (pl. dep. 24-32, 126-27). The defendant transferred Bowen to another office in December 2001 to be a branch manager. In February 2002, the plaintiff voluntarily stepped down from her branch manager position and resumed her status as an account executive. According to the plaintiff, the defendant assured her that Bowen would not be her new supervisor (pl. dep. 30-31). Bowen was subsequently assigned as the branch manager of the Anderson office and became the plaintiff's supervisor (def. m.s.j. 2). The plaintiff does not allege any acts of harassment during the time Bowen was her supervisor.

On April 6, 2002, the plaintiff reported her claim of sexual harassment by telephone to Mark Scarrow, the district sales manager. According to the plaintiff, Scarrow agreed to listen to her complaint only if she asked the accused sexual harasser (Bowen) to join the telephone call (pl. dep. 31; Rice dep. 55). The plaintiff responded that she would do so, but she also wanted to ask someone to listen to the call. Accordingly, the plaintiff

2

asked her co-worker Fleda Rice to listen to the telephone call (pl. dep. 30-31).  According to Rice, Scarrow told the plaintiff several times to "get off the phone" while the plaintiff was trying to tell him about Bowen's inappropriate behavior (Rice dep. 54-55).  Scarrow told Bowen, "I understand why you're upset, buddy" (Rice dep. 100).  Rice further testified in her deposition that Scarrow told the plaintiff more than once to "shut up" and later told her in an angry voice to "get out of the office" (Rice dep. 100).  The plaintiff then e-mailed Scarrow and requested a transfer to the defendant's Greenville, South Carolina, branch office (pl. resp. m.s.j., ex. G).  She then left and did not return to the Anderson office and was later transferred to the Greenville office for the remainder of her employment.

Within a few hours of the plaintiff's report of harassment, Bowen sent an e-mail to Scarrow and Louis Dinzeo, the division general manager, regarding a customer named Derrick Rich who had come into the Anderson branch to discuss a loan for which he had applied.  Rich stated to Bowen that he had owned his home for only three weeks.  However, when Bowen examined the application that had been entered by the plaintiff, he discovered the information had not been entered accurately (pl. resp. m.s.j., ex. G; pl. resp. m.s.j., ex. A, Jeff Bowen dep. 178-79).  Dinzeo asked Bowen to go through and verify the last 10 personal homeowner loans that the plaintiff had processed (Bowen dep. 181-82).  Bowen testified that when he did so, he discovered that all but one or two "had been misrepresented" (Bowen dep. 181-82).

On April 6, 2002, the defendant's regional quality assurance control manager, Anne Collier, was asked by Dinzeo to order an individual audit of the loans processed by the plaintiff (def. m.s.j., ex. 6, Collier aff. ¶ 5).  Collier directed Janet Spencer to perform the audit[1] (Collier aff. ¶ 6).  According to Collier, the audit revealed numerous demographic

---

[1] "An audit is generally conducted by contacting branch customers and asking them to verify information they reported to the Account Executives and then comparing that information to the information recorded on the loan documents" (Collier aff. ¶ 6).

3

errors in loans processed by the plaintiff and, based on the findings of the audit, Collier concluded that the plaintiff had intentionally manipulated demographic information in the loan applications to improve the customers' chances of being approved for the loans. Collier summarized her findings to the defendant's regional human resources manager, Mary Waugaman (Collier aff. ¶¶ 7-19).

According to Waugaman, Dinzeo asked her in April[2] 2002 to investigate the plaintiff's claims of sexual harassment against her by Bowen (def. m.s.j., ex. 4, Waugaman aff. ¶ 5). Waugaman testified in her affidavit that she was unable to corroborate the plaintiff's claims based upon interviews with employees in the Anderson office. However, several employees alleged improper conduct by the plaintiff. While the investigation was in progress, Waugaman received Collier's e-mail regarding the demographic errors on the plaintiff's loans. Based upon Collier's report, Waugaman recommended to Dinzeo that the plaintiff's employment be terminated, and Scarrow agreed with her recommendation. On April 24, 2002, Collier and Waugaman met with the plaintiff to discuss the results of the audit. Waugaman and Collier stated in their affidavits that the plaintiff was unable to explain the discrepancies in the demographic information. Waugaman told the plaintiff that her employment was being terminated because the company believed the customers were telling the truth regarding the demographic information they had provided to the plaintiff (Waugaman aff. ¶¶ 8-9).

The plaintiff filed a charge alleging harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC") on August 27, 2002. On September 30, 2003, the EEOC issued a determination that the defendant had "discriminated against [the plaintiff] with respect to retaliatory discharge." The EEOC further found that while the defendant has a harassment policy, it was not effectively utilized (pl. resp. m.s.j., ex. I0).

---

[2] Waugaman does not identify in her affidavit the specific date on which she was requested to start the investigation of the sexual harassment claim.

The plaintiff filed the instant action in state court on March 30, 2004, and it was removed to this court on August 9, 2004.

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at

5

252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), the allocation of proof is as follows: (1) the plaintiff-employee must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802-03).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

### *Hostile Work Environment*

> To state a hostile work environment claim, [the plaintiff] must allege that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender . . . ; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

*Bass v. E.I. Dupont de Nemours*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998)). Assuming there is evidence that the alleged harassment was motivated by her sex, the plaintiff's hostile environment claim still fails because the harassment was not sufficiently severe or pervasive to create an abusive atmosphere or to otherwise alter the plaintiff's conditions of employment. In evaluating whether harassment is severe and pervasive so as to make it actionable under Title VII, the court

"must examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Hopkins v. Baltimore Gas & Electric*, 77 F.3d 745 (4th Cir. 1996) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

These factors applied to the plaintiff's allegations do not support a finding that the harassment was sufficiently severe and pervasive.  The plaintiff complains of a handful of incidents that occurred over a period of approximately three months (October to December 2001).  This conduct is simply too infrequent to be pervasive.  *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (nine separate incidents over seven-month period not pervasive).  Similarly, the incidents at issue fall short of the level of severity necessary to create an actionable hostile environment.  The plaintiff has not claimed that Bowen made any overt sexual propositions or touched her in a sexual manner. Further, the alleged conduct was not physically threatening to the plaintiff, but instead qualifies as "mere offensive utterances" under the circumstances. Furthermore, the plaintiff was Bowen's supervisor at the time of the alleged harassment, and she took no action to discipline or counsel him.  There is no allegation of harassment during the time that Bowen was the plaintiff's supervisor.  Finally, the plaintiff has failed to demonstrate that Bowen's alleged conduct unreasonably interfered with her work performance.  Based upon the foregoing, the plaintiff cannot establish a *prima facie* case of hostile environment based on her sex.

### *Retaliation*

The plaintiff also claims that the defendant retaliated against her for her complaints of harassment by Bowen.  Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any

practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" 42 U.S.C. §2000e-3(a).  In order to establish a *prima facie* case of retaliation, the plaintiff must show that "'(1) she engaged in a protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action.'" *Matvia v. Bald Head Island Mgmnt.*, *Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)).

       The plaintiff claims that the defendant retaliated against her by not acting promptly on her request to transfer to the Greenville office and by terminating her employment, that Bowen retaliated against her by insisting that he enter her work time into the payroll system, and that Waugaman retaliated against her by not providing her any information after her termination regarding a loan that she had processed (pl. dep. 34-36, 38, 42).  Only the termination of her employment qualifies as an adverse employment action.  *See Munday v. Waste Mgmt. Of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (an adverse action is one in which the terms, conditions, or benefits of employment are adversely affected).

       It is undisputed that, prior to her report of harassment, the plaintiff had an exemplary work record.  There is no evidence that the defendant disciplined the plaintiff in any way prior to her termination from employment.  On the date of the plaintiff's report of harassment, Bowen, the subject of her report, e-mailed his superiors regarding alleged discrepancies in a loan application.  The division general manager, Dinzeo, asked Bowen to go through and verify the last 10 personal homeowner loans the plaintiff had processed (Bowen dep. 181-82).  Also on April 6, 2002, Dinzeo asked Collier, the quality assurance control manager, to order an individual audit of the plaintiff's loans, which she did (Collier aff. ¶ 5).  Thirteen days later, on April 24, 2002, the plaintiff's employment was terminated.

The defendant concedes that the plaintiff can establish a *prima facie* case of retaliation. However, the defendant claims that it terminated her employment for legitimate, nondiscriminatory reasons. First, the defendant claims that the plaintiff intentionally falsified demographic information on numerous loans for her own benefit (def. m.s.j. 29-30). Specifically, the defendant claims that during the audit of the plaintiff's loans, it discovered that the plaintiff was increasing customers' monthly income, fabricating or lowering the purchase price of customers' homes, fabricating or increasing the current value of customers' homes, and/or increasing customers' length of ownership or length of time at their current jobs to improve the customers' chance of being approved for a loan, which would result in a monetary benefit to her (def. m.s.j., ex. 7, Janet Spencer aff. ¶¶ 6-18, ex. A-H). Second, the defendant claims that the plaintiff engaged in serious misconduct during her employment (def. m.s.j. 30-32). Specifically, the defendant claims that the plaintiff violated its drug and alcohol policy by drinking alcoholic beverages during her lunch hour on several occasions and returning to work under the influence of alcohol (def. m.s.j. 30). The defendant also contends that the plaintiff violated its positive workplace environment policy by dancing on a desk, exposing her breasts to two female co-workers, flirting with a customer, and becoming intoxicated at company functions (def. m.s.j. 30-31).

As the defendant has carried its burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. The plaintiff testified that at the time of her termination, she was told that she was being fired for "ten demographic errors" (pl. dep. 36; pl. resp. m.s.j., ex. J, termination notes). The plaintiff claims that the first time the defendant alleged that she was fired for behavioral misconduct was seven months later when it submitted a position statement to the EEOC (pl. resp. m.s.j. 15). The plaintiff also claims that other employees, including members of management, participated in similar or worse conduct than that alleged by the defendant, but they were not fired. Specifically, she claims that

employees smelled alcohol on Matt Keegan, the former branch manager, and Jerry Hudgens, another member of management, and that almost all of the employees used profanity in the workplace. Rice testified that it was not unusual in a sales environment for someone to jump up on a desk to celebrate a big sale (pl. resp. m.s.j. 18; Rice dep. 82-83). Co-worker Brenda Clinkscales testified that many employees drank at lunch, and all of the managers for whom she had worked used profanity (pl. resp. m.s.j., ex. C, Brenda Clinkscales dep. 83). The plaintiff also argues that while members of management testified that they knew of some of the cited allegations against the plaintiff, they obviously did not consider them serious enough to take any action upon, much less to use as a reason for terminating her employment, until after her report of harassment (pl. resp. m.s.j. 17-18).

   The plaintiff also contends that numerous contradictions exist in the evidence regarding her alleged falsification of demographic information on loan applications. The defendant alleges that it contacted 10 customers and determined that the plaintiff had falsified documents supporting the issuance of loans for those customers (Waugaman aff. ¶¶ 8-9; pl. dep. 37; pl. resp. m.s.j., ex. J, termination notes). However, the plaintiff claims that some of those customers do not support these claims, either with respect to the specific numbers quoted by the defendant or whether they could say they dealt with the plaintiff in the first place. Further, the plaintiff claims that some customers contradict the defendant's representation that it contacted them during the investigation (pl. sur-reply 1-2; pl. resp. m.s.j., ex. L, independent investigation notes). For example, customer Vikki Tackett stated that she had not been contacted by Bowen or Spencer as claimed by the defendant (pl. sur-reply, attach. 3). The defendant argues that it does not matter what the facts are, as long as its managers legitimately believed the facts to be as stated by the defendant (def. reply 2). The plaintiff argues in response that the defendant's managers could not have legitimately believed the representations as it has set forth if the customers

were not actually contacted, if they did not make the representations attributed to them, and if the customers did not work with the plaintiff in the first place (pl. sur-reply 2-3).

Based upon the foregoing, this court finds that issues of material fact remain. Accordingly, this court recommends that summary judgment be denied on the plaintiff's retaliation claim.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment be granted on the hostile work environment claim and denied on the retaliation claim.

IT IS SO RECOMMENDED.

_____
BRUCE H. HENDRICKS
UNITED STATES MAGISTRATE JUDGE

June 13, 2005

Greenville, South Carolina